**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| ANIL KANCHARLA, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 1:25cv1540 |
| | ) | |
| UNITED STATES OF AMERICA, *et al.*, | ) | (Formerly Fairfax Circuit Court No. |
| | ) | CL2025-11995) |
| Defendants. | ) | |
| _____ | ) | |

## <u>MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT UNITED STATES'</u> <u>MOTION TO DISMISS AMENDED COMPLAINT</u>

Pursuant to Local Rule 7(F)(1), defendant, the United States of America, through its undersigned counsel, hereby respectfully submits the instant memorandum of law in support of its motion to dismiss with respect to plaintiffs' amended complaint in the above-captioned action.

## <u>INTRODUCTION</u>

In their original complaint, plaintiffs sought monetary relief in common law tort against William Pulte, the current Director of the Federal Housing Finance Agency – an agency of the federal government – for allegedly-defamatory comments that he made about the termination of unnamed employees of the Federal National Mortgage Association. Pursuant to the Westfall Act, in September 2025, the then-United States Attorney for this district certified that Director Pulte was acting within the scope of his federal employment at the time of the events giving rise to plaintiffs' claims. Although plaintiffs had a full and fair opportunity to challenge that scope certification, they elected not to do so; instead, plaintiffs *voluntarily dismissed* their claims against the United States (and thus, *a fortiori*, against Director Pulte himself).

Months later, plaintiffs have ostensibly had a change of heart, re-introducing Director Pulte in their recently-filed amended complaint. But that amended complaint contains no new factual allegations about Director Pulte's actions; as such, the Justice Department has re-certified that Director Pulte was acting within the scope of his federal employment at the time of the events giving rise to plaintiffs' claims. Plaintiffs still cannot come close to sustaining their burden under binding Westfall Act authority to overturn that scope certification, as District of Columbia law – applicable here —places Director Pulte well within the scope of his employment at the time of the relevant events. Indeed, the District of Columbia Circuit (consistent with other courts around the country) has repeatedly held that federal officials act within the scope of their federal employment when they interact with the media about the subject matter of their federal duties, and thus has affirmed Westfall Act certifications issued within the context of defamation claims. In so holding, these courts have rejected the two premises that seem to form the core of plaintiffs' forthcoming scope challenge. *First*, whether a federal employee's oral or written statement was factually false (and thus defamatory) is irrelevant; as this Court has itself acknowledged, "[t]he proper inquiry in intentional tort cases focuses on the 'underlying dispute or controversy, not on the nature of the tort.'" *Stephens v. United States*, 2015 WL 4885502, at *7 (E.D. Va. Aug. 14, 2015) (quoting *Council on Am. Islamic Relations v. Ballenger,* 444 F.3d 659, 664 (D.C. Cir. 2006)), *aff'd*, 628 Fed. Appx. 200 (4th Cir. 2016). *Second*, an employee remains within the scope of his employment even if his actions are not *explicitly* identified in a statute, regulation, or a position description, so long as it is "reasonably foreseeable" that the employee would engage in the action.

Because there can be no doubt that it is "reasonably foreseeable" that an agency head such as Director Pulte would interact with the media as a part of his position, he remains within the

scope of his federal employment and this Court should both affirm the Justice Department's scope certification and dismiss plaintiffs' claims against the United States.

## BACKGROUND

### I. THE FEDERAL HOUSING FINANCE AGENCY & THE FEDERAL NATIONAL MORTGAGE ASSOCIATION

To understand the alleged events giving rise to the instant civil action, it is important first to discuss two entities – the Federal Housing Finance Agency ("FHFA") and the Federal National Mortgage Association ("Fannie Mae").

**a.** Fannie Mae is a "government-sponsored enterprise," meaning that it was created by Congress to be owned by private shareholders and be publicly traded. *Jacobs v. Fed. Housing Finance Agency*, 908 F.3d 884, 888 (3d Cir. 2018); *see also* 2 U.S.C. § 622(8) (defining "government-sponsored enterprise"); 12 U.S.C. §§ 1716; 1717(a)(2)(B) (codifying the federal charter for Fannie Mae). Congress created Fannie Mae to "establish" and "provide stability in" the "secondary market" "for residential mortgages," as well as to "promote access to mortgage credit throughout the" United States. 12 U.S.C. §§ 1716(1); (4); *see also Montgomery County v. Fed. Nat'l Mortg. Ass'n*, 740 F.3d 914, 923 (4th Cir. 2014) (recognizing that Congress created Fannie Mae "to foster a nationwide secondary market").

**b.** Congress created FHFA in July 2008, in the wake of the national mortgage crisis that threatened the Nation's economy, as "an independent agency of the Federal Government." 12 U.S.C. § 4511(a); *see also* PUB. L. 110-289, 122 Stat. 2654 (July 30, 2008). FHFA is responsible for the "supervision and regulation" of, *inter alia*, Fannie Mae. *See id.* §§ 4502(20); 4511(b)(1).

The "head" of FHFA is the "Director," who is "appointed by the President of the United States, by and with the advice and consent of the Senate," for a five (5) year term, subject to removal by the President at will. *Id.* §§ 4512(a)-(b); *see also Collins v. Yellin*, 594 U.S. 220, 250-

51 (2021). Congress mandated that the Director "oversee the prudential operations of" Fannie Mae and "ensure," *inter alia*, that Fannie Mae "operates in a safe and sound manner," "carries out its statutory mission only through activities that are authorized and consistent" with federal statute, and "operate[s] [] consistent with the public interest." *Id.* § 4513(a). William Pulte is the current FHFA Director, having been confirmed by the United States Senate on March 13, 2025,[1] after being nominated to the position by President Trump.

In addition to these general "supervisory and regulatory" powers, Congress also provided the FHFA Director with discretionary authority to appoint FHFA as the "conservator" of Fannie Mae "for the purpose of reorganizing [or] rehabilitating . . . [its] affairs." *Id.* §§ 4617(a)(1)-(2). If the FHFA Director exercises this discretionary authority, *FHFA* statutorily inherits all the "rights, titles, powers, and privileges" enjoyed by Fannie Mae, *id.* § 4617(b)(2)(A), and may "take over the assets of and operate" and "perform all of the functions of" Fannie Mae that "are consistent with the appointment as conservator or receiver," *id.* §§ 4617(b)(2)(A)(i); (b)(2)(B). In September 2008, the then-FHFA Director exercised this authority and placed Fannie Mae and the Federal Home Loan Mortgage Corporation ("Freddie Mac") into conservatorships under FHFA. *See The Appointment of FHFA as Conservator for Fannie Mae & Freddie Mac*, *available at* <https://www.fhfa.gov/news/testimony/the-appointment-of-fhfa-as-conservator-for-fannie-mae-and-freddie-mac> (visited Sept. 12, 2025). Those conservatorships have remained in place ever since. *See, e.g.*, *Annual Housing Report (Oct. 2025)*, *available at* <<https://www.fhfa.gov/document/ annual-housing-report-2025>> (visited Nov. 18, 2025).

---

[1] Director Pulte was sworn into office the next day, on March 14, 2025.

## II.    FACTUAL BACKGROUND[2]

On April 3, 2025, Fannie Mae informed approximately 100 employees that they would be terminated from employment based on "violat[ions]" of "Fannie Mae's Charitable Giving program" through "fraud." *Am. Comp.*, ¶¶ 20-21.  This civil action does not challenge the propriety of those terminations;[3] rather, it seeks monetary relief with respect to purportedly defamatory statements that Director Pulte issued about those terminations.

The complaint identifies three such statements – each of which was made by Director Pulte in the news or media context.  The first two statements were contained within a news release – presented on FHFA's official website and bearing the agency's header – a screenshot of which Director Pulte posted to X (formerly known as Twitter) on April 8, 2025, under the heading "Fannie Mae Fires Over 100 Employees for Unethical Conduct, Including the Facilitation of Fraud."  *Id.* ¶¶25-29 & ex.1.  The entirety of that news release is as follows:

> Today, the U.S. Federal Housing Finance Agency [] and Fannie Mae issued the following statement:
>
> "In President Trump's housing market, there is no room for fraud, mortgage fraud, or any other deceitful act that can jeopardize the safety and soundness of the housing industry," said William J. Pulte, Chairman of the Board of Directors of Fannie Mae.  "Since my swearing-in, we fired over 100 employees from Fannie Mae who we caught engaging in unethical conduct, including facilitating fraud, against our great country.  Anyone who commits fraud against Fannie Mae does so against the American people."
>
> "I would like to thank Director Pulte for his empowering of Fannie Mae to root out unethical conduct, including anyone facilitating fraud.  We hold our employees to the

---

[2]Unless otherwise indicated, the following factual discussion is derived exclusively from the non-conclusory factual allegations contained within plaintiffs' amended complaint.  The inclusion of such allegations here should not be construed as the United States' concession of their veracity.

[3]The terminated employees have challenged these terminations in a separate civil action brought against Fannie Mae alone in the United States District Court for the District of Columbia.  *See Kancharla v. Fed. Nat'l Mort. Ass'n*, No. 1:25cv2346 (D.D.C.).

highest standards, and we will continue to do so," said Priscilla Almodovar, President and Chief Executive Officer of Fannie Mae."

*Id.* ex.1.  The news release ends with an explanation that "[t]he [] FHFA regulates and oversees Fannie Mae, Freddie Mac and the 11 Federal Home Loan Banks."  *Id.*  Plaintiffs allege here that Director Pulte's quote was false.  *Id.* ¶¶28-29; 36.  The final statement at issue here was a part of an interview with Director Pulte on April 9, 2025, during a television program on Fox News called "The Ingraham Angle."  *Id.* ¶30.  During that interview, the host of the program asked Director Pulte about the aforementioned terminations; as a part of his response, Director Pulte stated that "[w]e also found that they were making donations to the charity and then getting kickbacks – the internal company charity."  *Id.* ¶31.

Plaintiffs maintain here that each of "[t]hese statements are demonstrably false," in that they "did not ever or any time" "[e]ngage in 'unethical conduct,' nor did they '[f]acilitate fraud,' '[r]eceive kickbacks,' [or] '[c]ommit fraud against Fannie Mae or the American People.'"  *Id.* ¶¶36; 42.

### III.  PROCEDURAL HISTORY

**a.**  Plaintiffs – at that time, forty-one (41) of the terminated Fannie Mae employees – commenced this civil action on August 12, 2025, in the Circuit Court for Fairfax County, Virginia. The operative complaint asserted two causes of action against Director Pulte and Fannie Mae, *Compl.* (Dkt. No. 1-1), ¶¶4-5, both sounding in tort under Virginia common law:  (1) defamation *per se*, *id.* ¶¶28-35; and (2) defamation by implication, *id.* ¶¶37-46. Plaintiffs sought compensatory damages in an amount "not less than" $1,000,000 for each individual plaintiff, and $350,000 in punitive damages for each individual plaintiff.  *Id.* at p.10.

**b.**  On September 12, 2025, Fannie Mae removed the action to this Court pursuant to 28 U.S.C. § 1441 (Dkt. No. 1).  And on September 14, 2025, pursuant to 28 U.S.C. § 2679(d)(1), the then-

United States Attorney for the Eastern District of Virginia certified that Director Pulte was acting within the scope of his federal employment at the time of the events giving rise to plaintiffs' claims. On September 16, 2025, the United States noticed its substitution, by operation of law, as party defendant in place of Director Pulte (Dkt. No. 4). Absent a successful challenge to the United States Attorney's scope certification, *see Guiterrez de Martinez v. Lamagno*, 515 U.S. 417 (1995), those claims that plaintiff initially presented against Director Pulte individually would proceed "as though [they] had been filed against the United States under the FTCA." *Sobitan v. Glud*, 589 F.3d 379, 383 (7th Cir. 2009). The United States simultaneously moved to dismiss those FTCA claims, explaining that plaintiffs had failed to present an administrative claim to FHFA, and that in any event, the United States had retained its sovereign immunity with respect to claims arising out of defamation (Dkt. Nos. 17-18).

Plaintiffs thereafter had a full opportunity – through an opposition to the United States' motion – to challenge either the United States Attorney's scope certification or the arguments presented by the United States in support of dismissal (or both). But plaintiffs did neither. Instead, on December 4, 2025, plaintiffs elected to voluntarily dismiss their claims, thus eschewing their opportunity to challenge the United States Attorney's conclusion that Director Pulte was acting within the scope of his federal employment at the time of the events alleged in their complaint (Dkt. No. 21) ("Plaintiffs . . . voluntarily dismiss all claims against Defendant the United States of America as the Substituted Party for William Pulte without prejudice in the Complaint in the above-captioned action against Defendant."). And although such a voluntary dismissal is self-executing, *see* FED. R. CIV. P. 41(a)(1)(A)(i), Judge Giles "so ordered" plaintiffs' voluntary dismissal the next day (Dkt. No. 22).

Fannie Mae's own motion to dismiss (Dkt. Nos. 15-16) remained pending. While briefing was ongoing with respect to that motion, the instant action was transferred – *sua sponte* – from Judge Giles to this Court. At the hearing on that motion to dismiss, counsel for the plaintiffs announced to this Court that despite plaintiffs' prior voluntary decision to dismiss their claims against the United States, they intended to "bring back [Director] Pulte as a defendant" if they were authorized to file an amended complaint, explaining that "there remain issues with regard to whether [Director] Pulte was acting in his government capacity" (Dkt. No. 28, at 3).[4] This Court granted Fannie Mae's motion to dismiss, but simultaneously granted plaintiffs leave to file an amended complaint (Dkt. No. 27).

**c.** On February 6, 2026, plaintiffs filed their amended complaint (Dkt. No. 29). That amended complaint added twenty (20) new named plaintiffs (bringing the total to sixty-one (61)), and names both Fannie Mae and Director Pulte as party defendants. *Id.* ¶¶6; 8. Other than adding to the number of plaintiffs, the amended complaint contains no new material factual averments with respect to Director Pulte's alleged defamatory actions; instead, plaintiffs add a series of *legal* statements:

- "The FHFA was created on July 30, 2008, when the Housing and Economic Recovery Act of 2008 (HERA) was signed into law, establishing it as an independent federal agency to oversee and regulate major housing finance entities like Fannie Mae, Freddie Mac, and the Federal Home Loan Banks." *Id.* ¶7.

- "The duties of the Director of FHFA are established as a matter of law by 12 U.S. Code § 4513." *Id.* ¶9.

---

[4]This statement – along with another to the effect that plaintiffs "would bring back [Director] Pulte as a defendant because . . . he was dismissed before there was a ruling on the United States' motion" (Dkt. No. 28, at 3) – borders on the non-sensical. The only reason that "issues" arguably "remain" on whether Director Pulte was acting within the scope of his employment at the time of the relevant events is that, despite having a full and fair opportunity to challenge the Justice Department's scope certification, *plaintiffs elected* of their own free will to *dismiss* their claims.

- "The duties of the FHFA as conservator of Fannie Mae are established as a matter of law by 12 U.S.C. § 4617." *Id.* ¶10.

And from these legal statements, plaintiffs draw their ostensible legal conclusion: "[t]here is no authorization nor delegation of duties from Congress in any of these legislative schemes for either the Director of FHFA or the Chairman of the Board of Directors of Fannie Mae to issue press releases concerning the reasons for termination of individual employees of Fannie Mae." *Id.* ¶11; *see also id.* ¶40 ("Making such statements in public about the reasons for firing individual employees of an entity in conservatorship is not among the duties delegated or directed by Congress to the Director of the FHFA."). In short, because the aforementioned statutory provisions do not precisely list "news releases" as amongst the FHFA Director's duties, Director Pulte could not have been within the scope of his federal employment with respect to plaintiffs' asserted claims.

Concomitantly with this motion, the United States has noticed its substitution for Director Pulte with respect to plaintiffs' amended complaint, based on Justice Department's re-issued certification that Director Pulte was acting within the scope of his employment.

## ARGUMENT

### I.   GENERAL STANDARDS

The district courts are courts of limited jurisdiction, possessing only the jurisdiction granted to them by the United States Constitution and by federal statute. *See Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 552 (2005). The plaintiff bears the burden of establishing this Court's subject matter jurisdiction. *See Strawn v. AT&T Mobility*, 530 F.3d 293, 296 (4th Cir. 2008). When a district court lacks subject matter jurisdiction over an action, the action must be dismissed pursuant to Federal Rule 12(b)(1). *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506-07 (2006). Although this Court may utilize the allegations contained within the four corners of the

plaintiff's complaint as evidence in determining whether it possesses jurisdiction over a dispute, it may also consider evidence outside the pleadings. *See Richmond, Fredericksburg, & Potomac R.R. Corp. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).

## II.   THE JUSTICE DEPARTMENT CORRECTLY CERTIFIED THAT DIRECTOR PULTE WAS ACTING WITHIN THE SCOPE OF HIS FEDERAL EMPLOYMENT

As noted above, given the new averments within the four corners of plaintiffs' amended complaint – as well as their counsel's commentary at the hearing on *Fannie Mae*'s motion to dismiss – it appears likely that plaintiffs intend to challenge the Justice Department's re-issued certification that Director Pulte was acting within the scope of his federal employment at the time of the relevant events and thus is entitled to Westfall Act immunity. Although somewhat unorthodox, the United States will thus address the scope of employment question at the outset, rather than (as binding Fourth Circuit authority allows) awaiting a formal scope challenge in plaintiffs' opposition memorandum. But first, before discussing the merits of that issue, a brief background about the substantive and procedural framework for such challenges is therefore appropriate.

### A.   WESTFALL ACT PROCEDURE

Formally promulgated as the Federal Employee Liability Reform and Tort Compensation Act, *see* PUB. L. 100-694, 102 Stat. 4563 (Nov. 18, 1988), and formally codified at 28 U.S.C. § 2679, the statute colloquially known as the "Westfall Act[5]" provides that the FTCA serves as the exclusive remedy "for injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting

---

[5]The statute is colloquially called the "Westfall Act" because it was promulgated to overturn the Supreme Court's decision in *Westfall v. Erwin*, 484 U.S. 292 (1988), which significantly limited federal employees' immunity from common law tort actions. *See, e.g.*, *Guiterrez de Martinez v. DEA*, 111 F.3d 1148, 1152 (4th Cir. 1997) (hereinafter *Guiterrez*).

within the scope of his office or employment." 28 U.S.C. § 2679(b)(1). And thus, as this Court has recognized, the Westfall Act provides federal employees with *absolute immunity* from suit in common law tort for those actions taken within the scope of their federal employment. *See Allan v. United States*, 401 F. Supp. 3d 681, 699 n.17 (E.D. Va. 2019) (Brinkema, J.); *see also Osborn v. Haley*, 549 U.S. 225, 229 (2007).

The Westfall Act also creates a specific procedural vehicle through which this absolute immunity is invoked and provided. The statute provides as follows:

> Upon *certification* by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

28 U.S.C. § 2679(d)(1) (emphasis added). Put simply, once this certification is made, the United States becomes the party defendant and the claims previously brought against the individual employee proceed exclusively under the FTCA. *See United States v. Smith*, 499 U.S. 160, 166 (1991). The Attorney General has delegated this certification authority to the United States Attorneys and Torts Branch Directors within the Civil Division of the Department of Justice. *See* 28 C.F.R. § 15.4(b).

Once, as here, the Department of Justice has certified that the defendant-employee was acting within the scope of his or her federal employment at the time of the incident in question, the plaintiff maintains the right to challenge the propriety of the certification. *See Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 436-37 (1995) (hereinafter *Lamagno*). The inquiry is one of law, and must be made by this Court alone, not by a jury. *See Maron v. United States*, 126 F.3d 317, 322 (4th Cir. 1997). Once plaintiff challenges the scope certification, the certification "serves as prima facie evidence and shifts the burden to the plaintiff to prove, by a preponderance of the

evidence, that the defendant federal employee was acting outside the scope of his employment."

*Guiterrez*, 111 F.3d at 1153.  As the Fourth Circuit has held:

> If the plaintiff does not come forward with any evidence, the certification is conclusive. Moreover, the plaintiff's submission must be of specific evidence that contradicts the Attorney General's certification decision, not mere conclusory allegations and speculation. If the plaintiff's evidence is sufficient to carry the burden of proof, the defendant federal employee or the Government may come forward with evidence in support of the certification.

*Id.* at 1155.

Even though this procedure – and its limits – are mandatory aspects of binding Fourth Circuit authority, they are not simply rote procedural niceties.  Far to the contrary, and important to this Court's resolution of any scope certification challenge here, these limitations are an inextricable part of the substantive protections that the Westfall Act provides to federal employees. The Supreme Court has held that the Westfall Act's protections are identical to absolute immunity in the § 1983 or *Bivens* context, and thus are intended to "relieve covered employees from the cost of defending the lawsuit, and to place those burdens on the Government's shoulders."  *Osborn*, 549 U.S. at 252.  The Fourth Circuit has therefore "recognize[d] that immunity under the Westfall Act, like other forms of absolute and qualified immunity, 'is an *immunity from suit* rather than a mere defense to liability.'"  *Guiterrez*, 111 F.3d at 1154 (emphasis in original) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  Because these immunity doctrines provide extensive protection from any discovery, it is imperative that the issues raised by a scope challenge be "decided at the earliest opportunity." *Osborn*, 549 U.S. at 252; *see also U.S. Tobacco Cooperative Inc. v. Big South Wholesale of Va., LLC*, 899 F.3d 236, 252 (4th Cir. 2018) (reiterating that "district court[s] should remain cognizant of the considerations weighing against protracted litigation under the Westfall Act" (quoting *Guiterrez*, 111 F.3d at 1154)).  And it is for this reason that any order denying certification to Director Pulte (or sustaining plaintiff's scope challenge) here, is

immediately appealable to the court of appeals through the collateral order doctrine. *See Osborn*, 549 U.S. at 238.

### B.    THE ISSUANCE OF NEWS RELEASES AND MEDIA INTERVIEWS ARE WELL WITHIN THE SCOPE OF AN AGENCY HEAD'S EMPLOYMENT

That brings one to the merits of the scope of employment question here; namely, whether the Department of Justice correctly concluded that Director Pulte was within the scope of his employment as Director of the FHFA at the time of the events giving rise to plaintiffs' claims – issuing a news release and conducting a media interview. As detailed below, well-established authority upholding Westfall Act scope certifications under virtually indistinguishable circumstances requires that question to be answered in the affirmative.

1.    The first issue in addressing this question is what body of scope of employment law applies. The determination of whether Director Pulte was acting within the scope of his employment requires evaluating his alleged actions under "the law of the state where the conduct occurred." *Guiterrez*, 111 F.3d at 1156; *see also Jamison v. Wiley*, 14 F.3d 222, 227 n.2 (4th Cir. 1994). This standard points to the application of District of Columbia law here.[6]

As discussed above, plaintiffs' claims against Director Pulte are premised upon two acts – (1) a "press" (or "news") release; and (2) a media interview. Both Fannie Mae and FHFA are headquartered in the District of Columbia. *See* 12 U.S.C. § 1717(a)(1) (providing that the "Federal National Mortgage Association" will have its "principal place of business in the District of Columbia"); *Contact Us*, *available at* <https://www.fhfa.gov/contact> (visited Mar. 1, 2026) (" FHFA is an independent federal regulatory agency located in Washington, D.C."). In addition to

---

[6]As discussed below, *see infra* n.10, the correct scope result here is not dependent on the application of District of Columbia law; indeed, the application of Virginia would yield the same result.

the release's "Washington, D.C." byline, *Am. Comp.*, ex.1, this demonstrates that the press release finds its situs in the District of Columbia. Additionally, "The Ingraham Angle" – the television program on which Director Pulte's allegedly-offending media interview occurred – is taped at Fox News' studios in the District of Columbia. *See Laura Ingraham Joins Fox News' Prime-Time Lineup*, *available at* <https://www.foxnews.com/entertainment/laura-ingraham-joins-fox-news-prime-time-lineup> (visited Mar. 1, 2026) ("Laura Ingraham will host a new weeknight primetime show on FOX News Channel from Washington D.C. . . . ."). District of Columbia scope of employment law should thus apply to the scope inquiry here.

**2.**     The District of Columbia has adopted a rather liberal scope of employment doctrine. More specifically, the District of Columbia utilizes the scope of employment framework articulated in Restatement (Second) of Agency, *see Wuterich v. Murtha*, 562 F.3d 375, 383 (D.C. Cir. 2009), which provides as follows, in pertinent part:

> Conduct of a servant is within the scope of employment if, but only if:
>
> (a) It is of the kind he is employed to perform;
>
> (b) It occurs substantially within the authorized time and space limits [of the employment];
>
> (c) It is actuated, at least in part, by a purpose to serve the master; and
>
> (d) If force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

RESTATEMENT (SECOND) OF AGENCY § 228(1) (1958). The first and third prongs are the most substantive (and the fourth does not apply), and thus they warrant further explication.

**a.**     On the first prong – whether the act in question is "of the kind" that the employee "is employed to perform" – District of Columbia courts have held that the employee's "actions must have either been of the same general nature as that authorized or *incidental* to the conduct authorized." *Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659, 664 (D.C. Cir. 2006)

(per curiam) (emphasis in original).  And "conduct is 'incidental' so long as it is 'foreseeable,' and it is 'foreseeable' if it is a 'direct outgrowth of the employee's instructions or job assignment.'" *Allaithi v. Rumsfeld*, 753 F.3d 1327, 1332 (D.C. Cir. 2014) (quoting *Haddon v. United States*, 68 F.3d 1420, 1424 (D.C. Cir. 1995), *abrogated on other grounds by Osborn v. Haley*, 127 S. Ct. 881 (2007)).  This focuses on the objective act itself, not its allegedly "wrongful character." *Jacobs*, 724 F.3d at 221.  At bottom, this is not a "particularly rigorous" test, and District of Columbia court apply it "liberally." *Allaithi*, 753 F.3d at 1332.

It is on this basis that plaintiff's ostensible scope challenge – based on the new material that they added to their amended complaint – falls flat.  As noted above, plaintiffs focus sharply on the *express statutory* duties of the FHFA and its Director, reasoning that because the statutes identifying these duties do not include the issuance of news releases (or, presumably, conducting media interviews), those actions could not possibly be in the scope of Director Pulte's employment. *Am. Comp.* ¶¶7-11; 40.  But as the above authority explicitly provides, conduct does not need to be expressly authorized (whether in a statute, regulation, or position description) to be within the scope of employment; rather, it is conduct that is *either* "authorized **or incidental to the conduct authorized**" that is within scope.  Indeed, as will be discussed in greater detail *infra*, courts across the country have held dissemination of events and media contacts to fall within the scope of a federal employee's employment. *See Aversa v. United States*, 99 F.3d 1200, 1210-13 (1st Cir. 1996); *see also Bello v. United States*, 93 Fed. Appx. 288, 290-91 (2d Cir. 2004) (per curiam); *Mac Isaac v. Cable News Net., Inc.*, 2023 WL 6847101, at *5 (D. Del. Oct. 17, 2023); *Barry v. Whelan*, 796 F. Supp. 885, 891-92 (E.D. Va. 1992).

One other issue is worthy of discussion before proceeding.  During a recent hearing in this action, plaintiffs' counsel opined that he was unaware of any "case law that says that making a

defamatory statement is part of the official duties of a federal official." *Trans.* (Dkt. No. 28), at 4.

This statement is entirely inaccurate; indeed, as several courts have held, it turns the scope of

employment analysis upon its own head. As the Fourth Circuit has held on this score:

> The alleged tortious incident cannot be looked at in isolation from the context in which it occurred. As we stated in . . . a pre-Westfall Act common law immunity case:
>
> Few government authorities are authorized to commit torts as part of their line of duty, but to separate the activity that constitutes the wrong from its surrounding context—an otherwise proper exercise of authority—would effectively emasculate the immunity defense. Once the wrongful acts are excluded from an exercise of authority, only innocuous activity remains to which immunity would be available. Thus, the defense would apply only to conduct for which it is not needed.

*Johnson v. Carter*, 983 F.2d 1316, 1323 (4th Cir. 1993) (quoting *Wallen v. Domm*, 700 F.2d 124,

126 (4th Cir. 1983)), *rev'd on other grounds by Guiterrez*, 515 U.S. at 436-37. And as identified

above, the District of Columbia Circuit has similarly adopted this reasoning for purposes of District

of Columbia scope law. *See Jacobs v. Vrobel*, 724 F.3d 217, 221 (D.C. Cir. 2013) (holding that

scope inquiry focused on the objective act itself and not its allegedly "wrongful character").[7] With

particular respect to claims of defamation, the only thing that matters for purposes of the scope

inquiry is the context in which the statement itself was made, not whether that statement was false.

False (and thus defamatory) statements remain within the scope of employment.

---

[7]Indeed, this Court has itself recognized these aspects of District of Columbia scope doctrine. In *Stephens v. United States*, 2015 WL 4885502 (E.D. Va. Aug. 14, 2015) (Brinkema, J.), the then-United States Attorney for this district certified that a Department of Agriculture employee was acting within the scope of her employment by sending an electronic mail message that allegedly defamed the plaintiff. *See id.* at *2. Quoting *Ballinger*, this Court recognized that "[t]he proper inquiry in intentional tort cases focuses on the 'underlying dispute or controversy, not on the nature of the tort.'" *Id.* at *7 (quoting *Ballinger*, 444 F.3d at 664). And holding that it was the "e-mail, not the allegedly defamatory statement within that e-mail, [that] constitute[d] the 'underlying dispute or controversy' in [the] case," this Court affirmed the scope of employment certification. *Id.*

In the end, District of Columbia courts "apply the test 'very expansively,' and in essence ask 'whether the defendant merely was on duty or on the job when committing the alleged tort.'" *Allaithi*, 753 F.3d at 1330 (quoting *Harbury v. Hayden*, 522 F.3d 413, 422 n.4 (D.C. Cir. 2008)).

**b.**  On the third prong – concerning the "purpose" for which the employee engaged in the act in question – the internal clause (*i.e.*, "at least in part") is key.  In order to conclude that an employee was acting *outside* of the scope of their employment, "it is necessary to show [that] the employee's act was '*solely* for the servant's personal benefit' and 'not done for the employer's at all.'"  *Magowan v. Lowery*, 166 F. Supp. 3d 39, 62 (D.D.C. 2016) (quoting *Schecter v. Merchs. Home Delivery, Inc.*, 892 A.2d 415, 428 (D.C. 2006) (emphasis added)); *see also Allaithi*, 753 F.3d at 1333 (recognizing that employees remain within the scope of employment unless they "had no purpose to serve the master").  As such, "even a partial desire to serve the master is sufficient" to justify the conclusion that an employee was within the scope of their employment.  *Ballenger*, 444 F.3d at 665.

**c.**  Issuing news releases and speaking with the media are acts that are, *at the very least*, "of the kind" that Director Pulte was "employed to perform"; *i.e.*, it is certainly foreseeable that Director Pulte – especially as an agency head – would issue news releases and speak with the media.  And the federal courts in the District of Columbia have applied these principles to Westfall Act certifications issued in defamation claims brought against individual federal officers under virtually indistinguishable circumstances.

The District of Columbia Circuit's decision in *Ballenger* is an excellent example of this authority.  *Ballenger* revolved around an interview that a North Carolina congressman gave to a journalist, in which the primary subject was the congressman's separation from his wife.

*Ballenger*, 444 F.3d at 661-62. As the court recounted, the interview included the following colloquy:

> During the fifteen-minute conversation, Ballenger [the congressman] elaborated on the reasons why he and his wife had separated, chief amount them being his wife's dissatisfaction with life in Washington, D.C. In particular, Ballenger explained that his wife became increasingly uncomfortable living across the street from the headquarters of the Council on American-Islamic Relations ("CAIR") after the September 11th attacks. During the course of this explanation, Ballenger stated that CAIR was the "fund-raising arm for Hezbollah."

*Id.* at 662. Put simply, in this interview, Ballenger accused CAIR of terrorist financing, an extraordinarily-serious crime. *See* 18 U.S.C. § 2339B(a)(1). After CAIR sued Ballenger for defamation, and the Justice Department certified that Ballenger was acting within the scope of his employment under the Westfall Act, CAIR challenged the scope certification. The district court rejected the challenge, and the court of appeals affirmed.

The District of Columbia Circuit rejected CAIR's argument that "Ballenger's allegedly defamatory statement *itself* was not conduct of the kind he was employed to perform," holding that it "rest[ed] on a misunderstanding of D.C. scope of employment law (not to mention the plain text of the Westfall Act), which directs courts to look beyond alleged intentional torts themselves." *Id.* at 664 (emphasis in original). The "appropriate question" for scope purposes was whether the underlying "telephone conversation – not the allegedly defamatory sentence – was the kind of conduct Ballenger was employed to perform." *Id.*[8] Quoting liberally from a Fifth Circuit decision to the same effect, the court explained as follows:

> The legislative duties of Members of Congress are not confined to those directly mentioned by statute or the Constitution. Besides participating in debates and voting on the

---

[8]Moreover, the *Ballenger* court held that the mere fact that the overriding topic of conversation during the relevant media interview was the congressman's marital difficulties was not of moment, holding that despite the personal aspect of the interview, "Ballenger's conduct was motivated—at least in part—by a legitimate desire to discharge his duty as a congressman." *Ballenger*, 444 F.3d at 665. There was, of course, nothing contained in either the news release or media interview at issue here that was at all personal to Director Pulte.

Congressional floor, a primary obligation of a Member of Congress in a representative democracy is to serve and respond to his or her constituents.

*Id.* (quoting *Williams v. United States*, 71 F.3d 502, 507 (5th Cir. 1995)). Especially given that the scope question is approached "liberally," the court of appeals held that engaging with the press was within "the kind of conduct" expected of a congressman. *Id.* at 664-65; *see also Wuterich v. Murtha*, 562 F.3d 375, 384-85 (D.C. Cir. 2009).

There is no principled way to cabin the above discussion solely to Members of Congress, *especially* when the individual in question is, like Director Pulte here, a constitutional officer who serves as the head of an Executive Branch agency. In a representative democracy – especially in the modern United States, when so much of the federal government's work is undertaken through Executive Branch agencies – it is similarly important for Executive Branch leadership to keep the American people abreast of that work. It is thus entirely common for Executive Branch leaders to issue news releases to announce significant events, and for such leaders (and, at times, other rank and file employees) to sit for interviews with the media to answer questions and provide further detail about the same.[9] To continue the congressional analogy, the entire nation is the constituency of an Executive Branch agency head, and that agency head is expected to provide information about his or her agency's conduct in the interest of transparency. This is especially the case here, given FHFA's general "supervisory" authority over Fannie Mae, in addition to FHFA's current

---

[9]Indeed, United States Attorneys, Inspectors General, and countless other Executive Branch agency heads issue press or news releases to discuss the work that their agencies (or agency components) conduct on behalf of the American people. *See., e.g.*, U.S. Attorney's Office, Eastern District of Virginia, *Virginia Beach Man Charged With Dealing Illegal Machineguns* (May 5, 2022), *available at* <https://www.justice.gov/usao-edva/pr/virginia-beach-man-charged-dealing-illegal-machineguns> (visited Mar. 1, 2026); Office of Inspector General, U.S. Dep't of Health & Human Services, *HHS-OIG Issues Notice of Exclusion to Owner of 7 Louisiana Nursing Homes* (May 23, 2022), *available at* <https://oig.hhs.gov/newsroom/news-releases-articles/nursing-home-exclusion/> (visited Mar. 1, 2026).

conservatorship of Fannie Mae; *i.e.*, there is a particularized reason for the FHFA Director to announce significant issues and/or actions occurring at Fannie Mae through news releases or media interviews.

But this is not something limited to congressmen and women and agency heads. To the contrary, as identified earlier, courts have routinely held that federal employees' media contacts remain within the scope of their employment. Take the First Circuit's decision in *Aversa v. United States*, 99 F.3d 1200 (1st Cir. 1996). There, plaintiff brought defamation claims against an Assistant United States Attorney and a law enforcement officer with the Internal Revenue Service, alleging that they had conspired to have the United States Attorney's Office for the District of New Hampshire issue a press release – and conducted a press conference with "local and national news media" – that stated that plaintiff "had been arrested for money laundering." *Id.* at 1204. More specifically, although the AUSA and IRS agent "knew" that plaintiff was "not involved in laundering illegally-gotten money, or in drug trafficking, tax evasion, or organized crime," the press release and conference "created the impression that they were." *Id.* The First Circuit affirmed the district court's rejection of plaintiff's Westfall Act scope certification challenge under New Hampshire law, which, like the District of Columbia, has adopted the Restatement's test. *See id.* at 1210. The *Aversa* court held that the AUSA and IRS Agent's statements were at the least "incidental to authorized duties," and that they "acted at least in part to serve their employers' interests in keeping the public informed of law enforcement efforts." *Id.* This was so even though the AUSA's comments were both expressly unauthorized (under both federal regulations and internal Justice Department policy) and "tortious," because they remained "a means . . . of accomplishing the Justice Department's objective of informing the public of recent law enforcement efforts." *Id.* at 1212. Indeed, the *Aversa* court expressly provided that it had "little

doubt" of its conclusion in this regard. *See id.* at 1213; *see also Bello v. United States*, 93 Fed. Appx. 288, 290 (2d Cir. 2004) (upholding Westfall Act scope certification in defamation action originally brought against Equal Employment Opportunity Commission line attorney who accused corporation of sexual harassment in media interview).[10]

Nor does the unique nature of the position of FHFA Director as Fannie Mae's conservator change this conclusion. Plaintiffs here, of course, were not employed by FHFA; they were Fannie Mae employees. Director Pulte, in his role as FHFA Director, serves also as the Chairman of Fannie Mae's Board of Directors. And plaintiff's amended complaint maintains that the allegedly defamatory statements "were made by Pulte on behalf, and in furtherance of the business interests, of Fannie Mae." *Am. Compl.*, ¶39. The problem with this putative argument is that given FHFA's conservatorship of Fannie Mae, one cannot divorce the "business interests" of Fannie Mae from the responsibilities of the FHFA Director. As noted above, once FHFA became Fannie Mae's conservator, *FHFA* automatically obtained all of the "rights, titles, powers, and privileges" that Fannie Mae possessed, may operate the entity with all applicable powers, and protect the entity's assets and property. 12 U.S.C. § 4617(b)(2)(A). Even though FHFA has delegated back to Fannie Mae the day-to-day functions of running the enterprise, the Conservator still has the obligation to oversee the business operations and retains the power to engage in those activities – the statute's "best interests" provision specifies that FHFA, as Conservator, may "take any action authorized by [HERA] which the Agency determines is in the best interests of the regulated entity or the

---

[10]Judge Merhige of this Court similarly held that two Bureau of Prisons' Correctional Officers remained within the scope of their federal employment when they provided private information about a high-profile inmate to a *Washington Post* reporter. *See, e.g.*, *Barry*, 796 F. Supp. at 891-92 (holding that media contacts by BOP personnel who disseminated private information about an inmate were within the scope of their employment because "clearly, the defendants contact with the media regarding [the inmate] "naturally grew out of, or was incident to' each employee's attempt to perform prison business").

Agency." 12 U.S.C. § 4617(b)(2)(J)(ii); *see Collins*, 594 U.S. at 238-39 (providing that HERA authorizes FHFA to act in "the best interests of ... the public" "[w]hether or not [that] [i]s in the best interests of the [Enterprises] or their shareholders").

Regardless, Director Pulte's conduct here falls easily on the FHFA side of the dividing line. The news release was issued from FHFA's website, bearing FHFA's header and FHFA contact information. Fox News introduced him as the FHFA Director. More importantly, though, announcing an important enforcement action involving Fannie Mae's operations certainly falls within the ambit of FHFA's general powers (*i.e.*, outside of its conservatorship) involving the "supervision" of Fannie Mae. *See* 12 U.S.C. § 4511(b)(1).

\*     \*     \*

In the end, the law is clear. An employee remains within the scope of his employment regardless of whether the actions in which he allegedly engaged were *expressly* identified as part of his position and even if those actions were tortious (*e.g.*, defamatory) in nature. All that matters is whether the employer could "reasonably foresee" the employee taking such actions as a part of his position. As the District of Columbia courts have now repeatedly held, when it comes to an official such as Director Pulte, there can be little doubt that it was at the very least "reasonably foreseeable" that he would issue news releases and make statements to the media. This Court should therefore reject any scope challenge that plaintiffs assert here.

## III.   THIS COURT LACKS JURISDICTION OVER PLAINTIFFS' FTCA CLAIMS AGAINST THE UNITED STATES

It is by now axiomatic that the United States and its agencies enjoy sovereign immunity from suit unless Congress has explicitly abrogated such immunity. *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994); *Pittston Co. v. United States*, 199 F.3d 694, 701 (4th Cir. 1999). The FTCA serves as a limited waiver of the United States's sovereign immunity, *see Medina v. United States*, 259

F.3d 220, 223-24 (4th Cir. 2001), as it authorizes the United States to be held liable in tort only "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Nevertheless, Congress has promulgated a number of exceptions to the FTCA's limited waiver of sovereign immunity, each of which both serves as a limitation on the jurisdiction of this Court and must be strictly construed in favor of the United States. *See Medina*, 259 F.3d at 223-24; *Robb v. United States*, 80 F.3d 884, 887 (4th Cir. 1996). The instant motion relates to two such limitations: (1) the requirement that individuals first present an administrative claim to the relevant federal agency prior to seeking relief in this Court; and (2) the so-called "intentional torts proviso," which retains the United States' sovereign immunity for certain intentional torts putatively committed by its employees.

## A. PLAINTIFF HAS NOT PRESENTED AN ADMINISTRATIVE CLAIM TO FHFA

Initially, the FTCA conditions this Court's jurisdiction over any claim brought pursuant to its provisions on a plaintiff's prior presentment of an administrative claim to the allegedly responsible agency and the denial of that claim by the agency:

> An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail.

28 U.S.C. § 2675(a); *see McNeil v. United States*, 508 U.S. 106, 111 (1993); *Henderson v. United States*, 785 F.2d 121, 123 (4th Cir. 1986) (holding that presentment requirement of § 2675(a) is "jurisdictional and may not be waived"). As indicated by the attached declaration, plaintiffs have failed to present an administrative claim to FHFA. *See Jones Declaration*, ¶6 (attached at Exhibit

A).[11]  Because plaintiffs did not present an administrative claim to FHFA, let alone wait for the agency to deny such a claim (or the passage of six months' time) before filing their instant complaint, this Court should dismiss plaintiffs' FTCA claims against the United States for a lack of subject matter jurisdiction.

**B.**  **THE UNITED STATES HAS NOT WAIVED ITS SOVEREIGN IMMUNITY ON ANY OF PLAINTIFFS' CLAIMS**

Typically, the dismissal of an FTCA action on the basis of a plaintiff's failure to comply with the administrative presentment requirement is entered *without* prejudice, such that plaintiff might have an opportunity to comply with the statute's provisions in that regard.  *See* 28 U.S.C. § 2679(d)(5) (explaining circumstances in which litigant's late presentment of administrative claim after dismissal remains timely in cases of certification and substitution under §§ 2679(d)(2)-(3)). But in the instant circumstances, there exists no reason to encourage plaintiffs to expend the time and resources to generate and file an administrative claim with FHFA for the claims presented in their present complaint because this Court would lack subject matter jurisdiction over those claims – for defamation – even after plaintiffs properly filed an administrative claim and awaited the denial of the same (or the passage of six months' time from filing).  *See Burrell v. United States*, 2001 WL 34047380, at *4 (E.D. Va. Oct. 24, 2001) (dismissing civil action asserting FTCA claims with prejudice under identical circumstances), *aff'd*, 33 Fed. Appx. 85 (4th Cir. 2002); *see also Niblock v. Davis*, 2020 WL 5820546, at *4 n.5 (E.D. Va. Sept. 30, 2020) (holding that because plaintiff could not "plead around the absence of a waiver of sovereign immunity . . . the court [would] dismiss th[e] action with prejudice" (citing, *e.g.*, *Frigard v. United States*, 862 F.2d 201, 204 (9th Cir. 1988))).

---

[11]In analyzing motions to dismiss for lack of subject matter jurisdiction, this Court is entitled to review materials outside the pleadings.  *See White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005); *Velasco v. Government of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004).

Pursuant to the so-called "intentional tort exception" of the FTCA:

The provisions of this chapter and section 1346(b) of this title shall not apply to . . .

(h) Any claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, *libel, slander*, misrepresentation, deceit, or interference with contract rights . . . .

28 U.S.C. § 2680(h) (emphasis added); *see also Levin v. United States*, 568 U.S. 503, 507 (2013) (terming § 2680(h) the "intentional tort exception"). The common law tort claims that plaintiffs assert here are listed within the exception to the waiver of sovereign immunity. *See, e.g.*, *Jordan v. Donahoe*, 2013 WL 2950516, at *4 (E.D. Va. June 13, 2013) (holding that because "'[d]efamation' is simply Virginia's term for libel and slander," the United States, through § 2680(h), has "not waived sovereign immunity for defamation suits"). Because the United States has thus retained its sovereign immunity over plaintiffs' claims, this Court lacks subject-matter jurisdiction over this civil action, and the same should be dismissed with prejudice.

///

///

## CONCLUSION

For the foregoing reasons, this Court should dismiss plaintiffs' claims against the United

States with prejudice.


Respectfully submitted,

TODD W. BLANCHE
DEPUTY ATTORNEY GENERAL

By:           /s/_____
DENNIS C. BARGHAAN, JR.
Chief, Civil Division
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: (703) 299-3891
Fax:       (703) 299-3983
Email: dennis.barghaan@usdoj.gov

DATE: March 2, 2026          ATTORNEYS FOR THE UNITED STATES

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this date, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will transmit a Notice of Electronic Filing ("NEF") to the following:

Milton C. Johns
Executive Law Partners, PLLC
11130 Fairfax Boulevard, Suite 303
Fairfax, Virginia  22030
Email:  mjohns@xlppllc.com

Brian Patrick Quinn
O'Melveny & Myers LLP
1625 Eye Street, N.W.
Washington, DC 20006-4001
Email: bquinn@omm.com

Date: March 2, 2026

       /s/
DENNIS C. BARGHAAN, JR.
Chief, Civil Division
Assistant U.S. Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Telephone: (703) 299-3891
Fax:      (703) 299-3983
Email:  dennis.barghaan@usdoj.gov

ATTORNEYS FOR THE UNITED STATES